RENDERED:  MARCH 28, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1264-MR

MARQUIS CHENAULT                                                    APPELLANT

v.
APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE LUCY A. VANMETER, JUDGE
ACTION NO. 21-CR-01247

COMMONWEALTH OF KENTUCKY                                    APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CETRULO, EASTON, AND TAYLOR, JUDGES.

TAYLOR, JUDGE:  Marquis Chenault brings this appeal from the Fayette Circuit Court's Final Judgment and Sentence of Imprisonment entered on September 28, 2023.  Chenault entered a conditional guilty plea on June 20, 2023, after the circuit court had entered an order on September 15, 2022, denying his motion to suppress evidence.  The circuit court's denial of Chenault's motion to suppress is the sole issue before this Court on appeal.  For the reasons stated, we affirm.

## INTRODUCTION

On July 29, 2022, Marquis Chenault filed a motion to suppress evidence obtained against him pursuant to the search of his vehicle as a result of an investigatory stop on September 26, 2021, in Lexington, Kentucky. Chenault alleged that the evidence was obtained in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Section 10 of the Kentucky Constitution. The Fayette Circuit Court held a suppression hearing on August 9, 2022, wherein the Commonwealth presented the testimony of Officer David Smith of the Lexington Police Department. Officer Smith's testimony included the presentation of body-worn camera footage taken during his encounter with the defendant. Following the hearing, the Court denied the motion to suppress. Chenault then entered a conditional guilty plea to the charge of trafficking in a controlled substance, fentanyl, and now appeals the court's ruling denying his motion to suppress.

## BACKGROUND

Officer Smith, as a part of a nightly patrol briefing on September 25, 2021, learned of a recent stolen vehicle report for a 2008 black Nissan Maxima with tinted windows, reported stolen as of September 23, 2021. That evening, he parked in his cruiser in a church parking lot on Price Road in Lexington. Just after midnight, he saw a Nissan appearing to match the description of the stolen vehicle

pass on Price Road. He pulled onto the road to follow the Nissan, but it was too far ahead for him to read the license plate. The driver of the vehicle took the first possible turn onto DePorres Avenue, then at the very next intersection, backed onto Tibbs Lane.

Officer Smith continued past Tibbs Lane, but continued to watch the Nissan in his rearview mirror. He observed the driver of the Nissan inch the nose of the automobile forward toward DePorres Avenue, then reverse back onto Tibbs Lane, at least two times. Officer Smith then turned his cruiser around and continued to watch the entrance to Tibbs Lane for several minutes as he knew Tibbs Lane was a dead-end street. Officer Smith then drove his cruiser toward Tibbs Lane to see if the driver was still in the vehicle. Officer Smith parked his cruiser on the opposite side of Tibbs Lane without blocking the Nissan. Because of the tinted windows, he was unable to see if the Nissan was still occupied. He illuminated the vehicle with overhead "white lights" which allowed him to observe that the driver's seat was reclined, as if the driver was trying to avoid detection.

Officer Smith then approached the Nissan. Upon approaching, Chenault then immediately sat up and reached down toward the floorboard. Officer Smith thought Chenault was manipulating something on the car floor for several seconds. At that point, Officer Smith ordered Chenault to show his hands. Chenault raised his hands into view whereupon Officer Smith asked him to roll

down his window. Simultaneous therewith, Officer Smith opened the driver's side door. With the door open, Officer Smith observed a torn piece of plastic wrap on the car floor at Chenault's feet, and a loaded magazine in the vehicle door pocket.[1]

Officer Smith then inquired if Chenault owned the car, requested his driver's license, and asked Chenault if he lived in the area. Chenault replied that he did not live near there and that his mother owned the car. Chenault further explained that he had been at work and had driven to this part of town after work. When Officer Smith opened the door, he got a whiff of marijuana which prompted him to ask Chenault if he had been smoking marijuana. Chenault acknowledged that he had been smoking and was going to sleep off the drug's effects in his car at that time.

At this point during their conversation, Officer Smith observed a handgun at Chenault's feet in the auto, which prompted Officer Smith to request backup over his police radio. Smith then requested Chenault place his hands on the steering wheel and had him exit the vehicle. He placed Chenault in handcuffs, but explained that he removed him from the auto because of the presence of the gun, and that Chenault was not under arrest. He explained that it was for

---

[1] Based on Officer David Smith's training, the torn piece of plastic was indicative of narcotics packaging.

everyone's safety because the officer was alone. Officer Smith retrieved the gun and placed it on top of the auto.

Two additional police vehicles approached on DePorres Avenue within five minutes of Smith's request for backup. Officer Smith at that point submitted the handgun serial number to determine if it was stolen, which was his common practice. He learned the gun was not stolen. One of the backup officers, Officer Owings, checked the license plate on the Nissan. Officer Owings advised Smith that the car was registered to a female. Then Officer Owings asked if Officer Smith had searched the vehicle based on the strong odor of marijuana from the interior. Officer Smith noted that his sense of smell was impaired from a recent case of Covid, although he thought he picked up some marijuana odor when he first opened the car door. Based on the "plain smell" of marijuana, the officers then searched the car.

The search by the officers turned up a clear plastic baggie containing fentanyl, a plastic spoon, a digital scale, a mason jar containing marijuana residue, and multiple portions of torn plastic baggies and wraps consistent with marijuana use. On December 7, 2021, a grand jury charged Chenault with trafficking in a controlled substance first degree, Fentanyl, enhanced by unlawful trafficking in Fentanyl, and doing so while in possession of a handgun. On July 29, 2022, Chenault filed a motion to suppress all evidence against him based on an alleged

improper stop and search of his vehicle. The trial court held an evidentiary hearing on August 9, 2022, and subsequently denied the motion to suppress.

After Chenault entered a conditional guilty plea in June of 2023, on September 28, 2023, the Fayette Circuit Court entered final judgment. Thereon, the court sentenced Chenault to five years for trafficking in a controlled substance, first offense, Fentanyl. This appeal followed.

## STANDARD OF REVIEW

This Court's standard of review of a circuit court's denial of a motion to suppress requires a two-step analysis. First, the circuit court's factual findings are conclusive if supported by substantial evidence. *Milam v. Commonwealth*, 483 S.W.3d 347, 349 (Ky. 2015). Second, the court's application of the law to those facts is reviewed *de novo*. *Simpson v. Commonwealth*, 474 S.W.3d 544, 547 (Ky. 2015). Our review proceeds accordingly.

## ANALYSIS

On appeal, appellant raises the following three arguments preserved by his conditional plea: 1) Officer Smith did not have reasonable suspicion to conduct an investigatory stop, 2) the officer's opening of the car door of the stopped vehicle constituted an unlawful search, and 3) the stop was unlawfully extended by the police.

Under *Terry v. Ohio*, 392 U.S. 1 (1968), "a police officer may briefly detain a person for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that the person has engaged in or is about to engage in criminal activity." *Williams v. Commonwealth*, 364 S.W.3d 65, 66-67 (Ky. 2011). *Terry*, 392 U.S. 1 establishes that a law enforcement officer's brief investigative detention of a person may constitute a seizure within the meaning of the Fourth Amendment, and as such may nevertheless properly be undertaken only if the police officer has a reasonable suspicion based upon objective, articulable facts that criminal activity is afoot. *Commonwealth v. Perry*, 630 S.W.3d 671, 674 (Ky. 2021).

A reasonable suspicion to justify an investigatory stop need not rise to the level of probable cause, though a mere "hunch" is not enough. *Commonwealth v. Marr*, 250 S.W.3d 624, 627 (Ky. 2008) (quoting *United States v. Arvizu*, 534 U.S. 266, 274, (2002)). The totality of the circumstances is evaluated to determine "the probability of criminal conduct, rather than the certainty." *Commonwealth v. Banks*, 68 S.W.3d 347, 351 (Ky. 2001) (citing *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Reviewing courts must examine "'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *United*

*States v. Sharpe*, 470 U.S. 675, 682 (1985) (quoting *Terry*, 392 U.S. at 20); *Gray v. Commonwealth*, 150 S.W.3d 71, 74 (Ky. App. 2004).

In arguing that the officer did not possess sufficient reasonable suspicion to conduct the investigatory stop, Chenault asserts that the court clearly erred because it did not recognize that the officer conducted a "seizure" of Chenault when he parked, shined his white lights into the vehicle, approached and asked Chenault to show his hands. On the contrary, we conclude that the court correctly assessed the facts and recognized that this was a "*Terry* stop" situation in which a stop and temporary seizure of the subject was justified on less than probable cause. *See Terry v. Ohio*, 392 U.S. 1.

The trial court found, and we agree, that Officer Smith was able to articulate a reasonable suspicion that he may have encountered a stolen vehicle whose driver was evading the officer's efforts to learn more about the driver or the vehicle. Initially, Officer Smith was following up on a specific stolen vehicle report he had just been briefed on that evening. The vehicle Chenault was driving was the same make, model and color, with window tint as the one reported stolen just days before, albeit a different model year. Chenault argues on appeal that these vehicles are not uncommon and the description relied on by the officer was "not so unique." Chenault's Brief at 6. But we conclude the officer's investigation simply followed details of the briefing specific to the patrol area he worked. The

Nissan stood out for closely matching the description of a stolen vehicle and being observed in a high crime area with a driver who seemed to be avoiding observation by police. Of course, Officer Smith did not rely on the stolen vehicle report alone since he did not initiate a stop of the vehicle after pulling behind him. Rather, he watched the behavior of the driver which only added to his articulable, reasonable suspicion that criminal activity might be afoot.

Chenault argues on appeal that the officer manufactured his claims of evasive movements because he knew the vehicle description alone was insufficient to justify an investigatory stop. Chenault points out that his driving and parking actions were not illegal driving maneuvers, as was admitted by Officer Smith at the hearing. Evasive behavior has been held to be a pertinent factor in determining reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

> When assessing the totality of the circumstances, "there is a 'demand for specificity in the information upon which police action is predicated.'" "We consider the information from which a trained officer makes inferences, such as objective observations and the method of operation of certain kinds of criminals, and whether that information yields a particularized suspicion that the particular individual being stopped is engaged in wrongdoing." While this "process does not deal with hard certainties, but with probabilities," reasonable suspicion is more than an "inarticulate hunch[.]"

*Commonwealth v. Conner*, 636 S.W.3d 464, 477 (Ky. 2021) (footnotes omitted).

Officer Smith explained why the actions taken by Chenault appeared to him to be evasive activity, and the circuit court accepted those explanations. The officer noted that immediately upon pulling onto the road to follow Chenault, Chenault took two immediate "first turns" which he recognized as an action taken by drivers who do not want to be detected by police. The circuit court also agreed with the officer that it was notable that Chenault backed his vehicle onto Tibbs Lane rather than make a left-hand turn, "so as to face DePorres Ave[nue] and obscure the license plate from Officer Smith's view." September 15, 2022, Order at 1. Additionally, the court found that Chenault's repeatedly "nos[ing] out' and "back[ing] up again" corresponded with the officer's belief based on his professional experience that Chenault was checking to see if the officer had moved on. September 15, 2022, Order at 2. The court concluded that Officer Smith adequately articulated a reasonable belief based on his training and experience that Chenault was "taking action to avoid detection." September 15, 2022, Order at 1. We agree.

As previously noted, in determining whether reasonable suspicion of criminal activity was afoot, our review must focus on the totality of the circumstances that existed facilitating the investigatory stop. Taking the totality, and not each action separately, we conclude that the trial court correctly determined that Officer Smith described the kind of evasive activity and conduct

-10-

that one might take in operating a stolen vehicle or when otherwise trying to evade police, while engaged in criminal activity, that would warrant an investigatory stop.

Chenault contends, nevertheless, that the circuit court's findings were clearly erroneous because the judge "simply accepted" the officer's factual assertions. At a suppression hearing, the trial court is vested with discretion to assess the credibility of witnesses and draw reasonable inferences from the facts; a reviewing court should give due weight to those assessments. *Sowell v. Commonwealth*, 168 S.W.3d 429, 431 (Ky. App. 2005); *Commonwealth v. Whitmore*, 92 S.W.3d 76, 79 (Ky. 2002). The trial court's acceptance of these explanations by the officer based on his training and experience did not demonstrate any error, particularly where substantial facts in the record supported the conclusions of the court.

Next, Chenault argues that when the officer asked him to roll down the car window and then, within seconds, opened the driver's side door, revealing a gun magazine and baggie, such action impermissibly converted the encounter from an investigatory stop into a seizure. The trial court concluded that opening a car door is no more intrusive than asking a driver to exit the vehicle for officer safety. The circuit court noted that Officer Smith had observed Chenault reach for

something in the floorboard and perceived a delay in Chenault's obedience of his commands to put his hands up.

"[A] car's interior as a whole is . . . subject to Fourth Amendment protection from unreasonable intrusions by the police." *New York v. Class*, 475 U.S. 106, 114-15 (1986) (citing *Mundy v. Commonwealth*, 342 S.W.3d 878, 882 (Ky. App. 2011)). However, "the reality of the dangers encountered daily by police officers dealing with on-the-street confrontations, mandate that an individual's private interests be balanced against the protection of the officer." *Docksteader v. Commonwealth*, 802 S.W.2d 149, 150 (Ky. App. 1991). In *Hampton v. Commonwealth*, 231 S.W.3d 740 (Ky. 2007), the Kentucky Supreme Court concluded that what is deemed a permissible intrusion must take into consideration the circumstance and the officer's need for safety. *Id.* at 747-48. In *Hampton*, the defendant exited a suspected drug house on foot and got into a parked car. On appeal, he argued that officers were not permitted to open the car door during an investigatory stop prior to asking him to exit the car. *Id.* at 747-48. The Court agreed that officers are required to use the "least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time[,]" but further noted that the scope of what is a permissible intrusion will vary with the facts and circumstances of each case. *Id.* at 747 (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Because the defendant had been seen running from a

house suspected of accommodating drug sales, the Court said it was reasonable to think he jumped in the car to dispose of evidence of a crime or perhaps to get a weapon. The Court held that an emphasis on officer safety within the short time to act rendered it appropriate for the officers to open the car door to see what the defendant was doing and to have him step out. *Id*. at 748.

The facts of this case demonstrate similar circumstances entailing a need to ensure officer safety within a short period of time. When Officer Smith trained the white lights from his cruiser on Chenault's vehicle, Officer Smith observed Chenault lean forward and reach to the floorboard toward his feet. Opening the door to the car rather than waiting for defendant to comply with the order to roll down the window was the least intrusive means for Officer Smith to observe the area within Chenault's control. As in *Hampton*, 231 S.W.3d at 747-48, the investigating officer had some reason to believe that Chenault's furtive movements upon approach may have been related to placing a weapon within reach. In fact, it appears Chenault was attempting to conceal the weapon found in the Nissan. Accordingly, we conclude that the steps taken by Officer Smith comported with the guidance in *Hampton* that a small intrusion into the vehicle by opening the door is permissible under the Fourth Amendment where the officer may have reason to believe that concealment of an object may hamper the investigation or endanger officer safety. *See Hampton*, 231 S.W.3d at 747-48.

-13-

Finally, Chenault argues that the stop was impermissibly extended by Officer Smith upon calling for backup officers, rather than by immediately calling in the license plate number to see if the vehicle was stolen. Chenault maintains that this renders the evidence found due to "plain smell" by the backup officers inadmissible. We initially note that the trial court correctly observed that the investigatory stop in this case was not what is termed a "traffic stop," since Officer Smith determined that Chenault had not committed any traffic violations and he encountered Chenault already parked. Thus, the cases cited by Chenault regarding traffic stops extending past the time needed to give a citation are clearly distinguishable as applied to the facts of this case.

Nevertheless, an investigatory stop, while it does not have a time limit, cannot be extended indefinitely either. In *Sharpe*, the Supreme Court held that there is no rigid time limitation on *Terry* stops. *Sharpe*, 470 U.S. at 685. Instead, we are instructed that the courts should "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id*. at 686.

Chenault argues that Officer Smith failed to timely run the license plate number, given that the stated reason for the stop was to investigate whether the vehicle was stolen. However, we agree with the trial court that the officers

sufficiently justified the time it took them to carry out the purpose for the investigatory stop. As Officer Smith testified, the license plate was not immediately readable when he first pulled onto Price Road to follow Chenault. With Chenault then taking what appeared to be evasive actions, the license remained out of view to the officer. Once Chenault's vehicle was backed in on Tibbs Lane, Officer Smith could not view the plate without approaching. Officer Smith explained that it would not have been prudent for him to walk to the rear of a vehicle he believed was possibly stolen without approaching and speaking to the driver first.

After he approached the Nissan and observed furtive activity (and seeing a weapon soon after), Officer Smith's primary concern was securing his safety. It was reasonable for him to wait a few minutes for backup rather than to retreat to the rear of the car, even after Chenault was removed from the vehicle. Officer Smith adequately explained that while he was stopped at the vehicle with Chenault, running the license plate number would have required that he go back to his cruiser to use his computer for an NCIC check or that he disconnect with dispatch in order to use a separate channel to request someone to run an initial license check. He stated that while alone with a suspect it was necessary to keep the line of communication with dispatch connected for his own safety in case of an

emergency. This clearly necessitated a delay in running the license plate number until backup arrived.

The circuit court noted that Officer Smith observed the handgun on the floor of the car within two minutes of initiating the stop, and he only had to wait 4-5 minutes for the backup officers to arrive. This only added a few minutes to the time Chenault was detained. Calling for backup was adequately explained to be for valid reasons other than to extend the purpose of the stop. We agree with the circuit court that the police officer pursued the purpose of the investigatory stop with reasonable diligence under these circumstances and Chenault was not unreasonably detained during this time. Thus, the detection by plain smell of marijuana by Smith and the backup officers was a valid reason for the search of the vehicle and the suppression motion was properly denied.

For the foregoing reasons, we affirm the Fayette Circuit Court's order denying the motion to suppress and final judgment thereon.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Russell J. Baldani
Whitney D. Rowe
Lexington, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

James Havey
Assistant Solicitor General
Office of the Solicitor General
Frankfort, Kentucky